HENRY ROZELL v. JANE REDDING.

59  331
59  477
59  479

59  331
115  270
115  272

*Bill for reconveyance of land deeded to wife—Balancing equities between the parties, when both are in the wrong—Relief against complainant's vice and folly cannot be granted.*

1. Pending divorce proceedings by defendant against complainant, on the ground of adultery, he conveyed to her the home farm in consideration of her agreement to discontinue her suit, pay him $300, and resume marital relations with him. She thereupon dismissed the divorce suit, gave him an agreement to pay the $300, and returned to the premises conveyed to her, taking up her abode thereon with complainant. Some months afterwards she filed a second bill against complainant and was granted an absolute divorce on the ground of adultery and drunkenness occurring since the resumption of marital relations between them.

   *Held*, in a suit brought to set aside said conveyance and secure a reconveyance from defendant of said home farm, that under complainant's own statement of the arrangement made with defendant, it is doubtful if he would be entitled to relief if he had kept himself clean and blameless; but in any event when he deliberately resumed his lewd and adulterous life, he lost the right, in a court of equity, to ask for the relief prayed for because of defendant's refusal to live with him any longer, even if she had not done complete equity in her dealings with complainant.

2. Where both parties are in the wrong, a court cannot balance the equities between them, nor give a complainant relief against his own vice and folly.

Appeal from Berrien.    (Blackman, J.)    Argued Jan. 5, 1886.    Decided Jan. 27, 1886.

Complainant appeals.    Affirmed.

*Edward Bacon*, for complainant:

The deed of the home farm ought to be set aside by reason of undue influence and over-reaching, or of deceit.    None of defendant's separate moneys were invested in the home farm: *Harrison v. Harrison*, 49 Mich. 240; it is evident that here is a case of a family arrangement where there was such imposition that the deed of the home farm ought to be set aside: *Thorn v. Thorn*, 51 Mich. 167; *Cathcart v. Robinson*,

5 Peters, 275 ; *Shanagan v. Shanagan*, 7 Ont. 213 ; *Gonch v. Bench*, 6 Ont. 707 ; *Thompson v. Mills*, 39 Ind. 528 ; complainant is entitled to reasonable relief under the principle of a vendor's lien if the court should not set aside the deed : *Bradley v. Bosley*, 1 Barb. Ch. 125 ; *Mills v. Bliss*, 55 N. Y. 144 ; in such a family arrangement whichever party has control by reason of the confidence of the other party or otherwise, has in equity the burden of proof to show fairness, justice, and that there was no abuse of confidence. If there was such abuse, unfairness, or injustice, or nothing more than evident inadequacy of consideration, a court of equity will grant relief in such form and manner as it pleases the court to select : *Sears v. Shafer*, 6 N. Y. 268 ; *Nesbit v. Lockman*, 34 N. Y. 167 ; *Mills v. Bliss*, 55 N. Y. 139 ; *Pierce v. Pierce*, 71 N. Y. 159 ; *Botsford v. McLean*, 45 Barb. 478, 488 ; *O'Rorke v. Bolinbroke*, 21 Moak, 68 ; *Frail v. Ellis*, E. L. & E. 457, cited and approved in *Hiscock v. Norton*, 42 Mich. 324.

*O. W Coolidge* and *Clapp & Bridgman* for defendant :

The claim for a reconveyance of the home farm is devoid of merit. It was made understandingly, voluntarily, and after ample time for consideration. Both the deed and contract were made by a man in the prime of life, in the full possession of his faculties and without any fraud, deception, concealment or overreaching. If at date of deed no cause existed for setting it aside, none has since existed. Complainant is the offending party, and this has been adjudicated by the solemn decree of a court, rendered irrevocable by his failure to appeal therefrom.

MORSE, J. It appears substantially from the proofs in this case that the complainant and defendant were married in 1850, and lived together harmoniously until 1862, when the complainant enlisted in the service of the United States. At the time of his enlistment he owned a home farm of 145 acres, and another piece of land known as the " Zerbe Lot." In 1859 he was the owner of another tract known as the " Edson Lot," and in that year deeded the same to his wife, then Jane Rozell, as he claims, in full settlement of some money obligations to her, he retaining, by verbal contract, the use and possession, which he was to enjoy during his life.

When he went into the army, he leased all his improved lands, including this Edson lot, to James H. Redding and Benjamin F. Needham, two unmarried men, instructing them to pay the rents to his wife, which they did.

In the spring of 1864 he came home on a furlough, and purchased a house and lot for his wife and family in the village of Dayton, to which they removed. He returned to the war, and remained until the close thereof, in 1865. When he came home for good, he found his family back on the home farm, his wife acting as housekeeper for Redding, who was working the place. His wife did not receive him with the affection he expected, but treated him coldly. In 1867 he bought another piece of land known as the "Needham Lot."

There being more or less trouble between complainant and defendant, a separation took place in 1869, when the defendant moved upon a piece of land which she had purchased of Redding, taking the children with her. Previous to this, in 1868, complainant had conveyed to her, as he claims voluntarily, the Needham lot, with the promise on her part that she would live with the children upon it.

While the defendant was living apart from complainant, she commenced proceedings against him for divorce, upon the ground of his adultery with various women. While this suit was pending, and on the sixteenth day of May, 1870, complainant conveyed the home farm to his wife, she discontinued her divorce proceedings, and came back to live with him. She allowed him to live with her until June 12, 1872, when she obtained a decree of divorce on the ground of his adultery. He remained in the house until sometime in the summer of 1873, when she locked him out, and threw his things out of the window. He then sought shelter elsewhere, and has never worked upon the premises since. He has never married again, but the defendant, in 1875, married James H. Redding, and has ever since lived upon the home farm, and enjoyed the property conveyed to her as aforesaid by complainant.

January 5, 1880, he filed his bill of complaint in this cause

in the circuit court for the county of Berrien, in chancery, asking that the deeds of the Edson lot and the home farm be declared void on account of the fraud, deceit and undue influence of his wife in obtaining them, and asking that she be decreed to release or convey the title of the same to him, or if the deeds were found not void, that he be declared entitled to a vendor's lien upon the land.

In relation to the Edson lot, he claims that, at the time he deeded it to his wife, she claimed that he owed her a large amount of money, and wanted he should convey her this land in payment therefor; that he thought the land worth more than what he owed her; the amount of his debt to her being, as he claims, $1,650. His wife then owned forty acres of land in Indiana. She finally made him a proposition that if he would deed her the Edson lot, she would release him from his debt to her, and convey to him the Indiana forty, and he might and should retain the possession of the Edson lot and have the rents and profits therefrom as long as he lived. He accepted the offer, and conveyed his land to Margaret Waggener, the mother of his wife, who then deeded to defendant. His wife promised upon her next visit to La Porte, Indiana, to make the deed of her land to him, alleging, as an excuse for not doing it then, that there were no blanks to be had of the form used in Indiana. He trusted her, but she never fulfilled her promise.

The defendant claims as to this Edson lot, that she purchased and paid for the same with her own separate means, derived from the estate of her father, and other of her relatives; that the understanding when it was bought was that the deed should be taken in her name; and that when complainant conveyed it to her it was right he should do it, and was done because he did not take the conveyance in her name, as he agreed to do. She denies any agreement to deed him the Indiana forty, or that she received this Edson lot in payment of $1,650 as stated by him.

The proofs seem to confirm the claim of the defendant as to the Edson lot, and it was not seriously contended on the

argument that complainant was entitled to any relief as to that piece.

But it is insisted on the part of the complainant that, in relation to the home farm, he has equities; that it was obtained from him by overreaching, undue influence and deceit, to carry out a cunningly devised scheme on his wife's part to acquire it upon the false pretense that she would live with him as she used to when they were first married, and, then, having procured the deed, proceed against him again for a divorce, so that she could marry James H. Redding; and, having accomplished her purpose and turned complainant out of doors, the court has power and ought to right the wrong by declaring the deed void, or by granting him the enforcement of a vendor's lien for the value of the living upon it, which he has been denied.

The evidence in reference to the conveyance of this farm is mainly found in the testimony of the parties. The complainant tells the following story:

"I was coming along; she came out, and called me. *Question.* What did she say? *Answer.* I went up to the gate where she was, and she said she had some wood near the house, under the snow, and she could not very well get it out. She asked me if I would not get it out for her. I told her I would do most anything to keep them from freezing; and I went and got it out, and carried it in the house. She asked me if I would not get her some wood. I told her I would, and I told her to look and see if Zerbe had come along. I told her that he was at Dayton. She said she would. I told her at the time to tell him to fetch over my sawing-machine. She said she would. I went down the next day; went to chopping logs. He came over with the machine. We drawed in the logs and sawed wood. I split it and corded it up,—twenty-one cords. *Q.* What took place between you and your wife soon afterwards. *A.* She said she wanted to come back again. I told her she could if she wanted to, after Michael Claire's time was out. She said she wanted to come back right away. I told her she could not. *Q.* What next? *A.* I don't know exactly how long, a while after that she said if I would give her a deed of a place she would come back, and live with me the same as she did when we were first married and I was to have my home there, to live with me as long as

I lived, if she lived that long. I told her if she would do that, I would give her a deed of it, and would as leave she would have a deed of it as me. I did not expect to take it with me when I died; and she said she would. *Q.* What was done in consequence of this talk? *A.* I give her the deed. *Q.* Is that the same deed just shown to you here? Was there any other consideration for this deed besides what you have mentioned? *A.* No, sir."

His wife gives this version of the transaction: That she left him the first time because of his drunkenness and lewdness; that she made no proposition to go back to live with him, and did not importune him to deed her the place.

" He wanted me to drop the suit, and live with him, and settle with him. He would give me the home farm, and I was to drop the suit, and I was to give him three hundred dollars in money. I told him I would if he would quit drinking and going with those women that he had been going with. He said he went with them women to provoke me. He said he would not go with them no more, and would not drink no more. A deed was made to me of the home place, and articles of agreement were made for me to pay him three hundred dollars the same day the deed was made."

We are inclined to believe defendant's statement, as an agreement to pay $300 was drawn up the day the deed was given, by the attorney, Mr. O. W. Coolidge, who drew the deed, and the names of the parties were subscribed thereto by him. This agreement to pay the $300 purported to be in consideration that the defendant was to have, with the farm, the corn, oats and wheat then growing thereon, and was witnessed by Coolidge.

It appears that both complainant and defendant wrote with some difficulty. Mr. Coolidge does not remember anything of the transaction outside of the papers, but thinks he drew it the same time he did the deed, and finds upon it a five-cent revenue stamp canceled by him. Mrs. Redding, the defendant, swears it was drawn by Mr. Coolidge, read over to her and complainant, and signed by Mr. Coolidge, in their names, at their request. It is not likely that this agreement is a forgery. It also mentions the conveyance of the home farm, but contains no suggestion that a condition of the

conveyance was the agreement of the wife to live with the husband, or that he should live there during his life. It is evident from the proofs that complainant was given to intoxication and consorting with lewd women, and that his wife was justified in seeking and obtaining a divorce from him. He complains that she did not treat him as kindly as she ought after his return from the army, and that her relations with Redding were too intimate. We think the proofs sustain him in the view that he, in some manner, lost her affections while away; and while we find nothing improper, in the sense charged by complainant, in her relations with Redding, yet we think the evidence shows that she regarded Redding, whom she subsequently married, with more favor than she did her husband; and after she obtained a deed of the home farm, she was not very backward in getting a divorce from him, ejecting him from the place, and marrying Redding.

It is true, by his conduct after she came back to live with him, in resuming his habits of drinking, and his associations with lewd women, he gave her ample excuse for the divorce; but she has shown, it seems to us, a desire to keep the whole of the property, and turn him out in the cold, not entirely consistent with the theory that she returned to him because of the existence of any marital love or affection towards him. She now has the home farm, the Edson lot, and all the property except the Zerbe lot, upon which she claims a lien; and is now seeking to hold the Needham lot in another suit submitted to us. Her marriage to Redding in 1875, two years after she discarded complainant, in view of her previous relations with him, bears out, in some degree, the theory of the complainant that she went back to live with him for the purpose of getting the farm, and then getting rid of him.

But this does not help his case any. Under his own statement of the arrangement, it is doubtful if he would be entitled to relief if he had kept himself clean and blameless. It was a foolish move upon his part to put this farm in the control of his wife, but his story does not show any undue

influence, fraud or deceit upon his wife's part that would void his deed. She made him a proposition, and he accepted it with joy, as he states in his bill. There was no particular importunity on her part, and he was not so much under her influence, or so anxious that she should live with him again, but what he told her, when she first spoke of coming back, that she could not until his tenant's time was out.

But be that as it may, when he deliberately went back to his lewd and adulterous life, he lost the right in a court of equity to ask that his wife shall convey back to him this farm because she refuses to live with him any longer, even if she has not done complete equity in her dealings with him. We cannot balance the equities between them when both are wrong, nor give the complainant relief against his own vice and folly.

The decree of the court below must be affirmed.

CAMPBELL, C. J., and CHAMPLIN, J., concurred.

SHERWOOD, J.   I concur in the result.